**UNITED STATES v. DONALDSON REALTY CO., Inc.**

No. 11403.

Circuit Court of Appeals, Eighth Circuit.

Sept. 16, 1939.

S. Dee Hanson, Sp. Asst. to Atty. Gen. (Sewall Key and Joseph M. Jones, Sp. Assts. to Atty. Gen., and Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for the United States.

Edward J. Callahan, of Minneapolis, Minn. (George R. Smith, of Minneapolis, Minn.; William J. Hughes, Jr., of Washington, D. C., and M. Arnold Lyons, of Minneapolis, Minn., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

The Donaldson Realty Company, Inc., brought this civil action in two counts for refund of income taxes alleged to have been "erroneously assessed and unlawfully collected from plaintiff" on account of income accrued in 1933 and 1934. The refund sued for in each count was assessed in respect to the amount of a certain claimed deduction from gross income which the Collector refused to allow. Trial was had to the court without a jury and at the conclusion of plaintiff's evidence both parties moved for judgment. The court made findings and the plaintiff was awarded judgment, from which the government appeals.

The plaintiff alleged in the first count of its petition, among other things, that an income tax return was filed by plaintiff upon which the plaintiff paid the tax computed upon and in accordance with the schedules therein. "That subsequently an additional tax assessment was made by the Collector of Internal Revenue in the sum of $6,296.24 which assessment was paid under protest on December 10, 1934." "That the basis of the alleged over-assessment was the disallowance of an item of expense in the sum of $24,705.05 for which plaintiff had taken credit in its return and plaintiff contends that such item was a proper deduction as an allowance of expense in its operations and as such was a proper deduction from taxable income during the year ending January 31, 1933." "That plaintiff is entitled to a refund in the sum of $6,296.24. That the entire controversy is concerning the one single item of $24,705.05 hereinbefore set forth. That this sum of money was paid by plaintiff to Northwestern Bank Building Company, a corporation, which is the owner of the premises of which plaintiff is a tenant * * * and plaintiff alleges that such item was an expense and should have been allowed as a deductible expense in its schedules." "The computation of the tax upon the schedules with this item disallowed and withdrawn from the schedules increased the tax by the sum of $6,296.24 which was the assessment herein described." (The second cause of action is like the first to the extent that decision of one will control the other.)

The government answered, denying each and every matter and thing in the complaint contained and each and every part thereof.

It appeared on the trial that the plaintiff and another corporation (Donaldson Realty Company—without "Inc.") had filed consolidated return for the tax year in question, the plaintiff being the "parent" corporation owning all of the stock of the other corporation. Each had net income taxable to it allocated and itemized in the consolidated return. The $24,705.05 item referred to in plaintiff's petition was returned as a deductible disbursement for "Building

Rents" by the 'subsidiary corporation. The plaintiff's sole witness testified that the money had been paid out to the Northwestern National Bank by the subsidiary corporation (not by the plaintiff as alleged in the petition). The witness also testified that the plaintiff corporation had "gone out of existence" at some time not specified. He also testified that the tax sued for and alleged to have been wrongfully collected was paid by the "parent" corporation *and* the subsidiary corporation (not by plaintiff as alleged in the petition). The case is therefore presented where suit against the government for tax refund is brought by a corporation, shown to have gone out of existence,[1] to obtain refund of tax not assessed in respect to its business or income and in respect to which it was not a taxpayer as defined in the statute, infra, and which was not paid by it. The government's answer put the plaintiff on its proof; the government's motion for judgment denied the sufficiency of the plaintiff's proof and the government's "Point Relied on Upon Appeal" specified the ruling on its motion for judgment as error.

We need not discuss the particular consequences which result from the fact that the two corporations elected to file consolidated returns (elaborately considered in Ford Motor Co. v. United States, Ct. Cl., 9 F.Supp. 590 and cases cited). The subsidiary corporation remained the "taxpayer" in respect to its taxable income. The definition is made by statute, which reads: "The term 'taxpayer' means any person, subject to a tax imposed by this title", 26 U.S.C. § 1696 (14), 26 U.S.C.A. § 1696 (14), and the subsidiary corporation, Donaldson Realty Company (without "Inc.") is hereafter referred to as the taxpayer. The consolidated return did not change its status as taxpayer, nor did it render immaterial the variance between the allegations of the petition and the proof, or the apparent incapacity of the non-existent corporation to maintain the suit. Affirmance of the judgment would operate to withdraw money from the Treasury of the United States, and it is traditional that the right to receive such money must always be shown by the applicant for payment. The courts can not feel themselves entirely exempt from the duty of scrutiny.

But we assume that the record might be completed by amendment or evidence. The controversy in the court below was upon the question whether the subsidiary corporation, the taxpayer, was entitled to the deduction which was claimed for it in the consolidated return and which was denied by the Collector. The court concluded that the subsidiary was so entitled; the government contends that it was not. In the findings of fact made by the court it was not found specifically that either the plaintiff corporation or the subsidiary corporation named in the consolidated return had disbursed the $24,705 item by way of rental or ordinary business expense of either particular corporation. The ultimate finding was that the payment "arose in the usual and customary manner in the conduct of the business of said companies in view of the particular circumstances" and so the judgment was given for plaintiff. The particular facts and circumstances were found by the court as follows:

"Plaintiff is a Delaware corporation licensed to do business and having its principal place of business in the City of Minneapolis, State of Minnesota.

"Prior to April 3, 1928, the L. S. Donaldson Company, a corporation, operated and managed a large department store in the City of Minneapolis. The rental property used to house its business was owned by the Donaldson Realty Company, a Minnesota corporation, which latter company owned or controlled by lease real estate covering the entire square block bounded by Nicollett and Marquette Avenues and Sixth and Seventh Streets, a portion of which block was occupied by the L. S. Donaldson Company in carrying on its mercantile business. The capital stock of the Donaldson Realty Company was owned by the L. S. Donaldson Company.

"The Northwestern National Bank of Minneapolis, a national banking association, operated a bank in that city. The quarters occupied by the Bank were deemed inadequate, and negotiations were entered into between the L. S. Donaldson Company and Donaldson Realty Company, generally referred to as the Donaldson interests, and the Bank for the construction of a sixteen-story building on part of the block hereinbefore referred to that would house the

---

[1] Oklahoma Natural Gas Co. v. Oklahoma, 273 U.S. 257, 47 S.Ct. 391, 71 L. Ed. 634; Bowe v. Minn. Milk Co., 44 Minn. 460, 464, 47 N.W. 151; Townsend v. Milaca Motor Co., 194 Minn. 423, 260 N.W. 525, 528; 47 A.L.R. 1288 note.

Bank and furnish adequate additional space for the L. S. Donaldson Company and provide general office space to be leased to tenants.

"It was agreed by and between the parties that a new corporation should be formed known as the L. S. Donaldson Holding Company, to which company approximately one-half of the block facing on Marquette Avenue should be transferred and upon which the proposed building should be erected. The property to be thus conveyed was appraised by impartial and competent appraisers at a valuation of $900,000. The Holding Company was to issue its stock of the part value of $900,000 to the Donaldson Realty Company in consideration for the transfer of said real estate. The Bank was to pay to the Holding Company $900,000 in cash in consideration for the issuance to it of a like amount of stock, and the additional money necessary to erect the building should be contributed equally by the Bank and the Donaldson Realty Company. It was further agreed that certain space should be allocated and leased to the Bank at a stipulated rental for a stipulated period, and in that a portion of the real estate to be occupied by the proposed building was then occupied by the L. S. Donaldson Company in carrying on its restaurant, grocery and meat departments, it was agreed that, in order to provide said company with adequate facilities and space for the operation of said departments, the third and fourth floors of the proposed building should be leased to the L. S. Donaldson Company for a period of twenty years at a rental of $108,000 per annum. The agreement containing the above provisions and the other details in connection with the erection of the proposed building and the respective obligations of the various parties is set forth in Plaintiff's Exhibit A, which was entered into by the Bank, the Holding Company, the L. S. Donaldson Company, and the Donaldson Realty Company, on April 3, 1928, and which was received in evidence as Plaintiff's Exhibit A, and by reference is made a part hereof.

"Although L. S. Donaldson Company was named as the lessee of the third and fourth floors of the proposed building in the agreement of April 3, 1928, (Plaintiff's Exhibit A), the agreement referred to both the L. S. Donaldson Company and the Donaldson Realty Company as the Donaldson interests, and in some portions of the agreement, in referring to the lessee of the third and fourth floors, the Donaldson interests are mentioned rather than the L. S. Donaldson Company. It fairly appears from this agreement and the evidence herein that it was assumed by the officials of the Donaldson companies that the Donaldson Realty Company, as well as the L. S. Donaldson Company, should be obligated upon the lease to the third and fourth floors of the proposed building.

"Subsequently, the real estate was transferred by the Donaldson Realty Company to said Holding Company, the Bank paid the agreed $900,000, and each of the companies received $900,000 par value of the Holding Company stock. The sole consideration for the issuance of the stock to the Realty Company was the said transfer of the said real estate. The sole consideration for the issuance of the stock to the Bank was the payment of the sum of $900,000 to the Holding Company. The Holding Company subsequently changed its name to the Northwestern Bank Building Company.

"During the year 1928, while the architects were working on the plans and specifications of the building as contemplated by Exhibit A, the L. S. Donaldson Company entered into negotiations to sell its mercantile business and stock of goods to the Hahn Department Stores, Inc. The Hahn Stores, however, did not desire a department for groceries, meats and a restaurant of the type contemplated by the L. S. Donaldson Company on the third and fourth floors of the new building. The Hahn Stores, Inc., was only interested in purchasing the merchandise unit, including the L. S. Donaldson Company's name, and desired to purchase said company free from any other assets or liabilities. In order to consummate the sale, which seemed desirable to the Donaldson interests, a new corporation, the Donaldson Realty Company, Inc., was formed under the laws of Delaware in the month of November, 1928, for the purpose of acquiring certain assets of the Donaldson interests which would not be purchased by the Hahn Stores. Thereafter, the Donaldson Realty Company, Inc., (Delaware) became the owner of all of the stock of the Donaldson Realty Company, as well as certain stocks and bonds, all of which were transferred to it by the L. S. Donaldson Company. In return for this transfer, the L. S. Donaldson Company received the stock of the Donaldson Realty Company, Inc., (Delaware). The Hahn Department

Stores, Inc., in purchasing the L. S. Donaldson Company, paid to the stockholders of that company in consideration for the transfer of the L. S. Donaldson Company stock, a certain amount of cash and all of the stock of the Donaldson Realty Company, Inc. (Delaware) which had been received by the L. S. Donaldson Company as hereinbefore stated. The completion of the transaction left the Hahn Stores the owner of the merchandise and the L. S. Donaldson Company name. The stockholders of the L. S. Donaldson Company received cash and became the owners of the stock of the Donaldson Realty Company, Inc. (Delaware), which company in turn owned the stock of the Donaldson Realty Company, the Minnesota corporation. In this so-called reorganization, the Donaldson Realty Company, Inc. (Delaware) assumed all of the obligations of the L. S. Donaldson Company, except certain items not material herein, including the obligation on the lease for the third and fourth floors of the proposed building, referred to in Exhibit A.

"When it appeared that the transaction with the Hahn Stores was to be completed and that this concern would not assume the obligation for the space in the new building allocated to the L. S. Donaldson Company for its purposes, negotiations were entered into between the President of the Donaldson interests and the bank officials for the purpose of making other arrangements regarding the said space. Neither the Donaldson Realty Company, which was a party to the April 3, 1928, agreement, nor the Donaldson Realty Company, Inc. (Delaware), which had assumed the L. S. Donaldson Company's obligation therein, had any use for this entire space, and after some negotiations, it was agreed that the entire agreement of April 3, 1928, Exhibit A, might be cancelled, and that a new agreement should be entered into between the Building Company, the Bank, the Donaldson Realty Company, and Donaldson Realty Company, Inc. (Delaware) covering the arrangements for the erection of the building and the covenants with respect thereto, including the modification and adjustment of the original lease which was to be taken by the Donaldson interests, whereby instead thereof and in substitution therefor, the Donaldson Realty Company would guarantee the rent for the fifth floor of the proposed building for a period of five years at an annual rental of $47,250. A new agreement between the Building Company, the Bank, Donaldson Realty Company, and the Donaldson Realty Company, Inc. (Delaware) was entered into on or about February 15, 1929, and has been received in evidence as Plaintiff's Exhibit C. The so-called rental guaranty agreement was entered into on that date between the Building Company and the Donaldson Realty Company, and was received in evidence as Plaintiff's Exhibit E; both exhibits are by reference made a part hereof.

"At the time Exhibits C and E were entered into, building operations had been commenced under Exhibit A. The Donaldson interests, including the Donaldson Realty Company, were vitally interested in the construction of the building as planned and in the consummation of the arrangements set forth in Exhibit A, except that they could not carry out their plans to occupy the third and fourth floors. In consideration of the cancellation of the covenants and obligations in Exhibit A, which could not be fulfilled by the Donaldson interests by reason of the sale of the mercantile department to the Hahn Stores, the Donaldson Realty Company entered into the rental guaranty agreement, Exhibit E.

"Thereafter, in pursuance of the modified arrangements and agreements set forth in Exhibit C, the building was erected and completed, and both the Bank and the Donaldson Realty Company contributed equally the additional funds that became necessary to construct said building. The Bank moved into its quarters and paid the stipulated rental to the Building Company. The Donaldson Realty Company occupied space on the fifth floor and, as contemplated by the parties, additional tenants were obtained for said floor, and the difference between the amount paid by said tenants and the annual rental of $47,250 was paid by the said Donaldson Realty Company in accordance with the agreement as set forth in Exhibit E.

"The fiscal year of the Donaldson Realty Company, as well as the Donaldson Realty Company, Inc. (Delaware), began on February 1st and ended on January 31st of each year. For the fiscal year ending January 31, 1933, tenants paid the sum of $22,544.95 for the space not used by the Realty Company, leaving a balance of $24,705.05. For the fiscal year ending January 31, 1934, there was collected from tenants of the fifth floor the sum of $28,242.06, leaving a balance of $19,007.94. Said sums of $24,705.05 and $19,007.94 were paid to the Building Company by the Don-

514

aldson Realty Company. Consolidated returns for income tax purposes were filed by the Donaldson Realty Company and the Donaldson Realty Company, Inc. (Delaware), and in the said returns of said companies for the fiscal years ending January 31, 1933, and January 31, 1934, plaintiff herein, the Donaldson Realty Company, Inc. (Delaware) took credit for said items. Subsequently, these items of deduction were disallowed, and an additional assessment of $6,296.24 was paid by the plaintiff under date of December 10, 1934, and on April 29, 1936, an additional assessment of $2,-006.05 was paid. Each of said additional assessments was based solely upon the disallowance of the aforsaid claimed deductions.

"Thereafter, and on or about October 27, 1936, plaintiff herein filed claims for refund for both years of the additional assessments made against said consolidated returns of the said two companies, and on February 3, 1937, the Commissioner of Internal Revenue denied said claims.

"The said payments made to the Building Company, as hereinbefore stated, arose in the usual and customary manner in the conduct of the business of said companies in view of the particular circumstances hereinbefore set forth, and the said payments were not capital expenditures."

 Among the findings one was included to the effect that the Donaldson Realty Company occupied space on the fifth floor of the new building, but such finding is not supported by evidence. Only one witness was sworn for the plaintiff and he was well versed in its affairs. He testified that the Realty Company maintained no office or staff of employees and had no employees except an accountant (part time) at six hundred dollars a year to keep records. There was no evidence where the records were lodged. It had no physical properties and the sole witness for the plaintiff said that it had no use for the space and that it was rented to outside tenants. He said that the Donaldson Realty Company had the privilege of renting to tenants, but did not dispute the record evidence that the fifth floor was leased by written lease to the Northwestern National Bank. The privilege was evidently extended merely to enable the Donaldson Realty Company to endeavor to secure tenants for the bank to minimize its liability upon its guaranty contract. The finding requested by the government "that plaintiff had no use for the space and that it at no

time occupied the space" is in accordance with the undisputed evidence.

 It will be observed that the court did not find that the $24,705.05 disbursement to the Northwestern National Bank, which is the subject of the controversy, was a payment of "rentals or other payments required to be made as a condition to the continued use or possession, for the purposes of the trade or business of property" on the part of the Donaldson Realty Company. The facts as found would not justify the deduction of the item under those provisions of the deduction statute which relate to rentals. Section 23, Revenue Act 1932, c. 209, 47 Stat. 169, Revenue Act 1932, § 23, 47 Stat. 169; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; Duffy v. Central R. R., 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846.

We think it is equally clear that the deduction could not be justified as a loss sustained by the taxpayer during the taxable year and not compensated for by insurance or otherwise within section 23, supra, (f). It is undisputed, as the court found, that the money was paid out in accordance with and to discharge the obligation evidenced by the taxpayer's written contract of rental guaranty executed in 1929, which was in words and figures as follows:

"Rental Guaranty.
"Guaranty of Fifth Floor Rentals by Donaldson Realty Company.

"Agreement, Made this 15th day of February, 1929, by and between Northwestern Bank Building Company, a corporation, party of the first part (hereinafter called the 'Building Company'), and Donaldson Realty Company, a corporation, party of the second part, (hereinafter called the 'Realty Company'),

"Witnesseth:

"In consideration of the Building Company signing and delivering that certain contract between the parties hereto and The Northwestern National Bank of Minneapolis, Minnesota, bearing even date herewith, it is agreed by and between the parties hereto as follows:

"During the five year period commencing with the date rentals accrue against The Northwestern National Bank of Minneapolis, Minnesota, under that certain lease between the Building Company and said Bank bearing even date herewith, or such later date as the fifth floor of the building of the Building Company hereinafter re-

ferred to, is ready for occupancy (such date to be certified by the architects of said building and so as to bind both parties hereto), the Realty Company will make the following payments to the Building Company:

"At the end of the first three (3) months of said period the Realty Company will pay to the Building Company the amount by which Eleven Thousand Eight Hundred and Twelve and 50/100 ($11,812.50) Dollars exceeds the gross rentals accrued during said three (3) months period for space on the fifth floor of the Building Company's building referred to in that certain contract between the parties hereto and The Northwestern National Bank of Minneapolis, Minnesota, bearing even date herewith. Payments similarly computed shall be made by the Realty Company to the Building Company covering each succeeding three (3) months periods during said five-year period. If for any such three (3) months period such rentals accrued during said three (3) months period for space upon said fifth floor exceed Eleven Thousand Eight Hundred and Twelve and 50/100 ($11,812.50) Dollars, such excess shall be carried forward and applied against and used to decrease the next succeeding payment or payments to be made by the Realty Company.

"If at the end of the five-year period the total rentals accrued for said fifth floor space, plus payments by the Realty Company, shall have exceeded Two Hundred Thirty Six Thousand Two Hundred and Fifty and 0/100 ($236,250.00), then such excess shall be refunded to the Realty Company by the Building Company, provided, However, that the amount of such refund shall not exceed the total of the amounts theretofore paid by the Realty Company hereunder."

The satisfaction by the taxpayer of such an obligation as is evidenced by the above contract is not a loss to the taxpayer within the deduction statute.

As it plainly appears that the $24,705.05 payment was neither deductible as rental nor as loss, we must turn to the other provisions of the deduction section 23, supra. It is well settled that "Whether and to what extent deductions shall be allowed depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed". New Colonial Ice Company v. Helvering, 292 U.S. 435–440, 54 S.Ct. 788, 790, 78 L. Ed. 1348. Our question here must be as recognized by counsel for appellee, whether the $24,705.05 payment was an ordinary and necessary expense of the taxpayer, the Donaldson Realty Company (without "Inc."), in carrying on its business.

In order to determine that question it is necessary to inquire how the Donaldson Realty Company came to make the rental guaranty contract. The undisputed evidence was that it guaranteed that the bank (lessee of the fifth floor of the new building) would realize $47,000 a year for five years from said fifth floor in consideration of the cancellation of another written obligation to pay $108,000 per annum for twenty years as rent for the third and fourth floors, and such was the finding of the District Court. The question then arises whether the obligation to pay the $108,000 so cancelled was an obligation of the taxpayer. It was created by the following terms of that contract which bound the parties thereto to put up the new building on the taxpayer's land and which fixed the contributions to be made therefor and the rights to accrue from such contributions:

"Now, Therefore * * * it is agreed * * *

"That the Building Company will lease to L. S. Donaldson Company [the department store company] the third and fourth floors of said building above the ground floor and space in the basement approximately one-half of the available basement space other than that devoted to general purposes, all for a period of twenty (20) years at a rental of One Hundred and Eight Thousand Dollars ($108,000) per annum."

The L. S. Donaldson Company was a corporation operating a department store, different from the taxpayer and not to be confused with it, and on the face of the above it would seem that the taxpayer had simply taken over and paid the compromised obligation of that corporation. If it did so gratuitously, it can not take deduction as necessary and ordinary expense. If there was consideration to the taxpayer, then its right to deduction depends on what that consideration was.

The taxpayer recognizes that to be the question. It contends that although the taxpayer was not the corporation to which it was agreed the third and fourth floors of the new building should be leased at $108,000 per annum, still the taxpayer had signed the contract looking to the erection of the new building and came therefore under an obligation in respect to the twenty

year lease at $108,000 per annum. The court's response to the contention is reflected in the finding made as follows: "It fairly appears from this agreement and the evidence herein that it was assumed by the officials of the Donaldson companies that the Donaldson Realty Company, as well as the L. S. Donaldson Company should be obligated upon the lease to the third and fourth floors of the proposed building."

Assuming without deciding that the conclusion was correct and that the taxpayer corporation had assumed obligation in respect to the twenty year $108,000 lease by the terms of the contract referred to in the finding, then there was obvious and ample consideration for the taxpayer to guarantee the collection of only $47,000 a year for five years upon the cancellation of the twenty year $108,000 obligation. The modified agreement called for payment of only a part of $236,000, the original for all of $2,160,000.

█ If such was the consideration upon which the taxpayer obligated itself to pay and paid the $24,705.05 (and it is the only possible consideration suggested), then we must inquire into the nature of the obligation and consequent payment as it relates to deductibility under the deduction statute. If its source and origin was the contract looking to the erection of the new building, we must turn to that contract. It is very voluminous, but the substance of it relevant to the inquiry is that the taxpayer corporation was to contribute land and money and the Northwestern Bank was to contribute equally with the taxpayer (but in money only), and out of the joint contributions the new building was to result. The new property was to belong to a new corporation and the contributors were to be equal owners of the stock thereof (except as there were two extra shares of stock for the bank). But the deal was not a mere rental speculation. The bank was located on the corner and obligated itself in the same contract to lease and pay $150,000 a year for twenty years for two of the floors of the building and the rental agreement calling for payment of $108,000 per annum for twenty years, copied above, was also a part of the same deal and the same contract. Both the obligations assumed and the benefit to be apportioned were fixed by the contract. The benefits to the taxpayer corporation was half of the stock of the new building corporation and nothing else whatever relevant to this inquiry. What-

ever burdens were imposed on it by the contract were therefore obviously incident to getting the stock and nothing else. But outlays for such a purpose are not expense of carrying on business and are not deductible under section 23, supra.

The inevitability of that result is fully recognized by the taxpayer. To avoid it the taxpayer contends that although its guaranty contract and $24,705.05 payment grew out of the building agreement, and out of the obligation contained in that agreement to pay $2,160,000 rental, still it had nothing to do with acquisition of the stock which constituted the fruits of that contract to the taxpayer. It is stressed that the land which the taxpayer contributed under the contract was carefully appraised and was of the full value of $900,000 and that the stock was issued, dollar for dollar, for such value. The court's response to the contention is in the following finding: "The property to be thus conveyed was appraised by impartial and competent appraisers at a valuation of $900,000.00. The Holding Company was to issue its stock of the par value of $900,000.00 to the Donaldson Realty Company in consideration for the transfer of said real estate. * * * The sole consideration for the issuance of the stock to the Realty Company was the said transfer of said real estate".

It cannot be thought that mutual rights and obligations of the parties contracting to have the building put up on the taxpayer's land were fixed by oral understanding, nor is there any suggestion of oral testimony to vary the terms of the voluminous written contract. It is true that for every dollar of stock that was issued the bank and the taxpayer alike contributed a dollar in money or its equivalent. But the contract reads, "Now, therefore * * * in consideration of the mutual agreements herein made, it is hereby agreed"—so that each of the obligations assumed was expressly made consideration for the others. The witness for plaintiff clearly understood it so. He said: "The Donaldson Company was bound to pay $108,000.00 a year for twenty years * * * and the Building Company assumed that obligation by assuming an obligation for $236,000.00 for a period of five years". He said that the Donaldson Company would not have gone into the building deal unless the space could have been obtained. Of course the national bank could not lawfully have gone into the deal involving investment of more than a million

of the bank's money for acquisition and three million for rental except to obtain banking quarters.

Some confusion is injected by speaking of the leases as benefits or assets, instead of as obligations. They can not be so treated. They carried agreements to pay and such agreements to pay were within the clause of the contract "in consideration of the mutual agreements herein made it is agreed etc". There was no substantial basis to conclude that the money and property put into the building deal was the sole consideration for the stock that was to be and was the taxpayer's recompense for its two contributions, namely: one—parting with its land and money and, two—assuming the obligations which it assumed.

A lease may, of course, be a valuable asset to the lessee, dependent on the relation of rental value to the rental payable. There is no proof of value in this case. But the guaranty contract was given on account of and in compromise of the $2,160,-000 obligation upon the lease that was agreed to be taken. Such guaranty contract was essentially a burden. There was no gain provided therein for the guarantor.

■ Having traced its payment of the $24,-705.05 to the contract for the putting up of the new building and to an obligation to pay rent specified in that contract, that contract must be deemed to fix the nature of the disbursement of the taxpayer for tax purposes. Discharging the obligation which that contract imposed upon the taxpayer was not an expense incurred in carrying on its business. Nor did the court find that it was. The court found: "The said payments * * * arose in the usual and customary manner in the conduct of the business of said companies in view of the paticular circumstances hereinbefore set forth,".

There were no less than five corporations bearing the Donaldson name connected by the testimony with this case. Each was a taxable unit. There could be no tax laid with respect to "the business of said companies". At least one of the companies ceased to exist, there were changes of names, one sold out a large merchandising business, one disposed of realty at an advance in value of half a million dollars by nontaxable transfers. It is necessary to keep their distinct corporate identity separate in order to arrive at the just tax of any one. There is no question that all that

was done by the officers of these corporations was wisely, prudently and efficiently done. The compromising of the lease liability was no less so.

But the particular taxpayer whose tax is here involved could not show that it was engaged in carrying on any business in which it guaranteed rentals as an ordinary incident of carrying on the business or in which it paid or incurred the $24,705.05 as an ordinary and necessary expense of carrying on its business. It is not shown to have had any active business related to the tax here involved except the acquisition of its stock ownership in the corporation owner of the new building.

■ In the same paragraph of the finding last above set forth, the trial court also found that "the said payments were not capital expenditures". This finding is not related by the court to the business of the taxpayer but to "the business of said companies". The tax liability is not asserted in respect to an aggregation of companies or in respect to "Donaldson interests" as an entity. This particular taxpayer undertook to show that it paid the item as an ordinary and necessary expense of its business and the inquiry must be limited to that issue. It may well be that the body of stockholders in the several Donaldson corporations suffered detriment because of the breach of the agreement to lease the two floors in the new building. But the taxpayer in this suit did not sustain its burden of proof, that its disbursement was an ordinary expense of any business it was carrying on. It is not incumbent on the court to point out or determine how account of the money paid to discharge the guarantee of $236,000 rental to the bank shall ultimately be made for taxation. The burden was not on the government to prove that it was capital expenditure. But so far as the record discloses, the taxpayer has half the stock of the building company. It represents a contribution of realty appreciated half a million dollars since 1913. It is entirely free of the undertaking to pay $2,160,000 rent which was one of the "mutual agreements" "in consideration" of which the building contract providing for the stock issue was agreed to by the contracting parties. It would seem upon the record here that everything this taxpayer had to pay out to keep its holdings free of the obligations undertaken to acquire them must be allocated to such holdings, but it is not necessary to foreclose questions that might arise on

518

such an issue which has not been pleaded in this case.

The deduction claimed was not sustained. Judgment reversed with direction to dismiss.

GARDNER, Circuit Judge, concurs in the result.

SANBORN, Circuit Judge (concurring).

The only question with which this Court is concerned in this case is whether the payments made by the Donaldson Realty Company pursuant to the rental guaranty contract entered into on February 15, 1929, by the Donaldson Realty Company with the Northwestern Bank Building Company could lawfully be deducted by the Realty Company in determining its net income for the taxable years in question. If these payments were rentals, losses, or ordinary and necessary business expenditures, the conclusion reached by the District Court that they were deductible was a permissible conclusion which cannot be disturbed by this Court. If the evidence had been sufficient to justify a finding that the Realty Company had entered into the rental guaranty agreement for the purpose of compromising its own liability for rent under the agreement of April 3, 1928, which required the L. S. Donaldson Company to take a twenty-year lease on certain floors of the building to be erected, at an annual rental of $108,000, I would be of the opinion that the judgment should be affirmed upon the ground that the payments constituted ordinary and necessary expenses incurred in connection with the business of the Realty Company. The evidence, however, instead of disclosing that the Realty Company compromised its own liability for rent by the giving of this guaranty, clearly indicates that it made the guaranty for the sole and only purpose of relieving the L. S. Donaldson Company of its obligation under the agreement of April 3, 1928, so that the capital stock of that company could be sold to Hahn Stores. We have, therefore, a situation where one corporation has made payments under a guaranty voluntarily entered into for the benefit of its affiliate. While the District Court found that the officers of the Donaldson companies assumed that the Realty Company—which was a party to the agreement of April 3, 1928— was obligated under that agreement, which called for the leasing of the third and fourth floors of the building by the L. S. Donaldson Company, it does not find—and, I think, could not find—that the Realty Company was bound to lease those floors if the L. S. Donaldson Company failed or refused to do so. Under the circumstances, it is my opinion that the payments did not constitute either rentals, losses, or ordinary and necessary expenses of the Realty Company within the meaning of the applicable revenue act. For that reason, and that reason alone, I concur.